UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.  14-cr-00120-EMC-1 |
| Plaintiff, | |
| v. | **ORDER DENYING DEFENDANTS' MOTION TO SUPPRESS** |
| EDUARDO ALVAREZ, *et al.*, | Docket Nos. 537 - 541 |
| Defendants. | |

Moving defendants Jairo Hernandez and Miguel Ortiz, along with codefendants Castillo, Cortez, Garcia-Gomez, and Vasquez are alleged conspirators acting in furtherance of the Sureños criminal street gang.  In September 2012, the San Francisco Police Department sought and obtained a wiretap order from the San Francisco Superior Court to intercept communications from certain members of the Sureños street gangs in the Mission District of San Francisco.  The police subsequently sought and obtained an extension of the order in October 2012.  The United States pursued criminal charges in this Court, relying in part on evidence obtained from those wire intercepts.

On November 4, 2015, the moving defendants filed a motion to suppress the fruits of those wire intercepts, alleging violations of 18 U.S.C. § 2518.[1]  They argue that the wiretap applications failed to provide a full and complete statement of necessity; that the Superior Court incorrectly found there to be probable cause; that the Superior Court incorrectly found there to be necessity; and that the government intercepted certain communications beyond the scope of the Superior

---

[1] Defendants Cortez, Garcia-Gomez, and Vasquez filed joinders to the instant motion.  Defendant Castillo filed a "motion to join" the instant motion.

1    Court's orders.  The United States opposes the motion.  For the reasons discussed below, the Court

2    **DENIES** the Motion to Suppress as to each defendant.

3                    **I.    FACTUAL AND PROCEDURAL BACKGROUND**

4    A.    Sergeant Chorley's Initial Application for a Wiretap Order

5              On September 9, 2012, San Francisco Police Department Sergeant Chorley executed an

6    affidavit as part of an application for a wiretap order which he submitted to the San Francisco

7    Superior Court.  Scoble Decl. Ex. 2 (specific references by Bates-stamped numbers).  Sergeant

8    Chorley began the affidavit by introducing his credentials and particular expertise in investigating

9    Latin gangs.  WT-066-067.   Sergeant Chorley then described his knowledge of two Sureños

10   criminal street gangs known as the 16th Street and 19th Street cliques (hereinafter collectively

11   referred to as "Sureños") whom he had physically surveilled in some portions of the three

12   preceding years.  WT-073-074; WT-102.  Sergeant Chorley described these two Sureños street

13   gangs as operating primarily out of the Mission District in San Francisco, where they asserted

14   control over illegal narcotics and firearms trafficking by, among other things, committing violent

15   assaults and homicides.[2]  WT-073-074.  The affidavit named Mario Serrano, Freddy Arroyo,

16   Miguel Ortiz, Carlos Vasquez, and other then-unknown members and associates of the Sureños as

17   the targets of the wiretap application, with the aim of dismantling these Sureños organizations.[3]

18   WT-068.

19              Sergeant Chorley discussed a pattern of gang-related crimes committed or contemplated by

20   the Sureños dating back to at least June 2002, including more than thirty arrests and convictions in

21   that period.  Sergeant Chorley indicated that he intended to intercept the telephones belonging to

22   Serrano, Arroyo, and Ortiz (Target Telephones 1-3 respectively).  As evidence of their

23

24   [2] Sergeant Chorley also alleged that the Sureños organization satisfied the definition of a criminal
     street gang under California law, which penalizes active participation in criminal street gangs as a
25   substantive offense in addition to the acts done as part of the underlying criminal conspiracy or
     enterprise.  *See* California Penal Code Sections 186.22(a), 186.22(f).

26   [3] Serrano, Arroyo, and Vasquez had previously admitted gang membership to police; Sgt. Chorley
27   concluded that Ortiz belonged to the gang based on identification by reliable informants, and
     Ortiz' association with known gang members and frequenting of known gang areas on numerous
28   occasions.

**United States District Court**
For the Northern District of California

2

participation in the gang's activities, Sergeant Chorley detailed the following[4]:

| Table 1 (Serrano) | Offenses by Date | Description | Disposition |
| --- | --- | --- | --- |
| 1 | June 5, 2002 | Sale of narcotics to undercover officer | Narcotics conviction |
| 2 | July 29, 2002 | Strong arm robbery | Grand theft conviction |
| 3 | March 28, 2009 | Concealed heroin found on Serrano's person while being treated for gunshot wound received from suspected gang-related shooting | Narcotics conviction |
| 4 | October 30, 2011 | Serrano and Vasquez exchange coded messages discussing the procurement of contraband; Serrano asks for warning if Vasquez notices police observation | Vasquez's phone seized on October 31, 2011; disposition as to Serrano not stated |
| 5 | February 8, 2012 | Serrano and Sureños gang member Jonathan Aguilar exchange coded messages discussing the procurement of contraband; Serrano warns Aguilar that police may be monitoring text messages | Aguilar arrested and phone seized; disposition as to Serrano not stated |
| 6 | May 24, 2012 | Confidential Source 1 ("CS-1") informs police that he/she knows Serrano sells heroin and observed Serrano in possession of multiple ounces of heroin | Not stated |
| 7 | June 8, 2012 | Lorenzo Jimenez shot and killed in Sureños territory; approx. 2 hours later Serrano calls CS-1 to inform him/her | Not stated |

---

[4] Allegations appear throughout WT-073-099 and in the *Hobbs* Attachments attached as exhibits.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

| Table 1 (Serrano) | Offenses by Date | Description | Disposition |
|---|---|---|---|
| | | that Sureños "just put someone to sleep with [a firearm]", offers to provide CS-1 a firearm | |
| 8 | August 18-24, 2012 **(approx. 3 weeks before wiretap application)** | CS-1 reports that Serrano was currently selling heroin; Sgt. Chorley observes CS-1 converse with Serrano via telephone and text message to negotiate purchase of heroin; Sgt. Chorley observes Serrano deliver heroin to CS-1 as part of controlled buy | Not stated |

| Table 2 (Arroyo) | Offenses by Date | Description | Disposition |
|---|---|---|---|
| 1 | January 26, 2003 | Sale of narcotics to police officer | Narcotics conviction |
| 2 | October 26, 2007 | Arroyo and Sureños gang member Francisco Rivera assaulted a suspected rival gang member while in San Francisco County Jail | Rivera convicted of assault with a deadly weapon; disposition as to Arroyo not stated |
| 3 | March 24-31, 2011 | Confidential Source 2 ("CS-2") records in-person conversation with Arroyo discussing procurement of firearm; Arroyo calls CS-2 to arrange for sale location; Sgt. Chorley observes Arroyo deliver a handgun and ammunition to CS-2 | Not stated |
| 4 | August 30, 2011 | Vasquez and Arroyo exchange series of communications | Subsequent search of Vasquez' phone revealed that several |

**United States District Court**
For the Northern District of California

| Table 2 (Arroyo) | Offenses by Date | Description | Disposition |
|---|---|---|---|
| | | between themselves and other Sureños gang members within the hours before and after a reported homicide in gang territory.  In one series of texts, Vasquez tells Arroyo of his desire to "get" the victim. | Sureños had been alerting him to the victim's location in the two weeks prior to the homicide.  Following the homicide, Vasquez discussed possible flight to Mexico, his fear of life in prison; and the subsequent homicide investigation. |
| 5 | September 8-29, 2011 | CS-2 called Arroyo to negotiate purchase of firearm; CS-2 and Arroyo attempt to arrange purchase logistics; law enforcement observes Arroyo deliver a small-caliber firearm and ammunition to CS-2 | Not stated |
| 6 | August 6-22, 2012 **(Approx. 3 weeks before wiretap application)** | CS-2 spoke with Arroyo via telephone to arrange for purchase of firearm | Unable to complete purchase |

| Table 3 (Ortiz) | Offenses by Date | Description | Disposition |
|---|---|---|---|
| 1 | November 25, 2005 | Arrested for grand theft and gang participation | Prosecution dismissed for insufficient evidence |
| 2 | December 27, 2006 | Narcotics and gang participation arrests | Could not determine |
| 3 | July 3, 2012 | CS-1 recorded a telephone conversation with Ortiz for the purchase of methamphetamine; Sgt. Chorley observed Ortiz deliver | Not stated |

United States District Court
For the Northern District of California

| Table 3 (Ortiz) | Offenses by Date | Description | Disposition |
|---|---|---|---|
| | | methamphetamine to CS-1 | |
| 4 | July 10, 2012 | CS-1 recorded a second telephone conversation with Ortiz for the purchase of methamphetamine; Sgt. Chorley observed Ortiz deliver methamphetamine to CS-1 | Not stated |
| 5 | July 11, 2012 | CS-1 recorded a third telephone conversation with Ortiz for the purchase of methamphetamine; Sgt. Chorley observed Ortiz deliver methamphetamine to CS-1 | Not stated |
| 6 | August 29, 2012 **(approx. 2 weeks before wiretap application)** | CS-1 made a fourth recorded telephone call to Ortiz for the purchase of methamphetamine; Ortiz agreed to sell methamphetamine to CS-1 | Not stated |

Based on this pattern of conduct and the pattern he observed in relation to the other Sureños members, as well as his familiarity with the Sureños organization, Sergeant Chorley concluded that the wiretap targets would likely continue committing specific narcotics and firearms trafficking offenses and violent offenses as exemplified by the pattern he described.  He further concluded that they would continue to commit the substantive offense of active gang participation under California law (California Penal Code Section 182.22(a)).

Sergeant Chorley further set forth the basis for his belief that Serrano, Arroyo, and Ortiz would use the three target telephones in furtherance of the target offenses.  He pointed to recent incidents within weeks of the application for the order where each target was recorded in

United States District Court
For the Northern District of California

1  telephone conversations or text messages negotiating the sale of narcotics or firearms.  WT-083-

2  087.  He also pointed to phone records from three overlapping periods that he concluded showed a

3  high volume of contact between gang members during times when the police suspected they were

4  engaging in illegal transactions.  WT-098-099.  Sergeant Chorley pointed to their use of these

5  phones not just in connection with discrete offenses, but in connection to the continuing criminal

6  enterprise as a whole, and in relation to their active gang participation as defined by California

7  law.

8        Sergeant Chorley further asserted that no less intrusive means of investigation could

9  accomplish the goal of identifying and successfully prosecuting all of the Sureños members.[5]

10  Specifically:

11        1.    Confidential Informants

12        CS-1 was suspected of being an informant by some of the targets and was actively shunned

13  by them.  Sergeant Chorley, relying in part on his own familiarity with the Sureños gangs,

14  concluded that further inquiries by CS-1 into other gang activities would confirm suspicions of

15  informant status and put him/her at serious peril.  Additionally, CS-1 expressed unwillingness to

16  participate in long-term investigation whereby he/she could potentially acquire more information.

17        CS-2 attempted to make inquiries into other areas of the gangs' activities, but had only

18  been successful in initiating contact with Arroyo for the sale of firearms.  Arroyo had offered to

19  sell CS-2 a certain type of narcotic which Sergeant Chorley understood to be a kind of test by the

20  gangs to determine whether CS-2 may be an informant.

21        CS-3, a confidential source who had provided information to the police in relation to gang-

22  related homicide, had refused to testify and ceased communicating with police.

23        CS-4 and CS-5, informants with knowledge of some of the gangs' activities, refused to

24  testify.

25        CS-6, a confidential informant with knowledge of the gangs' activities, was in custody and

26  could not be released without arousing suspicion as to his/her informant status, nor was he/she

27

28        [5] Throughout WT-099-WT-108.

7

**United States District Court**
For the Northern District of California

1  deemed appropriate for release from custody at that time.

2  CS-1 - 6 all separately conveyed their individual fears to law enforcement for their safety

3  as a result of their cooperation and continued cooperation with law enforcement.

4  Sergeant Chorley knew of several unnamed sources who had previously led or might in the

5  future lead to evidence against some of the targets or relating to some of the target offenses, but

6  determined they would be unable to lead to the successful prosecution of the entire organization.

7  Sergeant Chorley was unable to determine the existence of any other informant who would enable

8  the police to successfully dismantle the entire organization.

9  2.   <u>Undercover Officers</u>

10  CS-2 made "attempts" to introduce an undercover officer into the organization which

11  failed.  Sergeant Chorley, relying in part on his own familiarity with these gangs, described entry

12  into the gangs as requiring early initiation in adolescence and sustained participation in violent and

13  illegal activities which made infiltration with undercover officers both risky and unlikely to

14  succeed.

15  3.   <u>Surveillance</u>

16  Sergeant Chorley described three years of previous personal surveillances of the target

17  subjects or other gang members.  Despite the varied successes of such surveillance, Sergeant

18  Chorley was not able to apprehend or determine the identities and roles of all members of the

19  gangs.  Additionally, Sergeant Chorley pointed to the gangs' general use of coded

20  communications, as well as specific instances where members of the gang warned against police

21  interest in their activities and where some of the targets refused to meet or speak with other

22  members or with informants about certain things unless they were sure of the lack of police

23  presence.

24  4.   <u>Phone Records</u>

25  Sergeant Chorley explained past attempts to analyze phone records for the target subjects

26  had allowed the police to identify some telephone numbers as belonging to known gang members.

27  However, the identities of other contacts were unknown.  Moreover, Sergeant Chorley stated that

28  he was unable to determine the content of such communications.

**United States District Court**
For the Northern District of California

5.      Searches and Arrests

Sergeant Chorley stated that while searches had previously enabled the police to obtain information relating to some of the targets or target offenses, "the ultimate goal of this investigation is to dismantle the Sureño criminal street gang comprised of numerous gang members that are engaged in a conspiracy to traffic in a variety of controlled substances, to possess and sell firearms illegally, and to repeatedly engage in violent crimes."  He stated that although future searches might potentially enable the police to uncover evidence of some narcotics or weapons sales, or possibly instruments used in connection with violent crimes such as homicides, they would not be successful in discovering all crimes committed in furtherance of the conspiracy.  For example, he stated that the police had searched the residences of Serrano and Vasquez and could not recover evidence which would meaningfully enable the police to complete their investigation into the conspiracy.

Similarly, Sergeant Chorley discounted arrests as a possible avenue for achieving the investigation's aims.  He noted that even if arrests achieved limited success, arrests would not be able to reveal the identities of other gang members and would only serve to notify them of police interest in their activities.

6.      Witness Interviews and Subpoenas

Sergeant Chorley noted that the secretive nature of the gangs' organization and the inability of police so far to determine the identities of all the conspirators made it impossible to identify whom to interview or subpoena as witnesses before a grand jury.  He further noted that because of the gang's nature and tendency for violence, it was impossible to identify witnesses who would be willing and able to aid in the achievement of the investigation's goals without notifying the gang members.

7.      Video Surveillance

Sergeant Chorley discounted video surveillance because of its inability to discern the identities of persons appearing on surveillance, as well as the lack of available cameras in areas known to be frequented by gang members.

United States District Court
For the Northern District of California

8.    <u>Mail Covers</u>

Sergeant Chorley discounted mail covers as a viable means of investigation in light of the fact that, among other things, some of the targets moved and changed residences frequently, rarely communicated about their crimes by the mail, and were more likely to use wire and electronic means of communication.

9.    <u>Trash Searches</u>

Sergeant Chorley discounted trash searches in light of the fact that, among other things, some of the targets lived in large, shared complexes with other individuals, that the subjects of the investigation would be unlikely to discard useful evidence of many of the target offenses in the trash, and that such a search may result in the subjects' detection of police interest in their activities.

In spite of all police efforts up to the point of the wiretap application, Sergeant Chorley noted that the Sureños had and continued to operate in much the same form for at least ten years, including in the previous few weeks before the application.

On September 9, 2012, at approximately 4:04 p.m., San Francisco Superior Court Judge Massullo approved the application, finding probable cause that Serrano, Arroyo, Ortiz, Vasquez, and other co-conspirators had committed, are committing, or were about to commit various offenses under California law, including narcotics, firearms, and gang offenses. Scoble Decl. Ex. 1. She further found probable cause that each target would use the target phones in connection with the target offenses and that a wiretap would yield particular communications related to the commission of those offenses. *Id.* She found that a wiretap was necessary to achieve the goals of the investigation and that no less intrusive means of investigation would succeed. *Id.* She issued an order authorizing a 30-day wiretap on the target telephones, to begin from the earlier of the date on which interception began or within ten days of the execution of the order.[6] *Id.*

Pursuant to the order, Sergeant Chorley began intercepting the target telephones on September 10, 2012, at approximately 10:20 a.m. Ross Decl. Monitoring temporarily halted as of

---

[6] Judge Massullo defined a "day" as the 24-hour period from the instant she signed the order.

United States District Court
For the Northern District of California

1   October 9, 2012 at approximately 11:40 p.m.  *Id.*

2   B.    The Application for an Extension of the Order

3        On October 22, 2012, Sergeant Chorley applied for an extension of Judge Massullo's order

4   to continue interception on two of the target telephones (Target Telephones 1 and 3).  Scoble Decl.

5   Ex. 12 (specific references by Bates-stamped numbers).  As the basis for his application, Sergeant

6   Chorley repeated many of the same allegations as his original application and noted that he had

7   since learned of new instances of contraband trafficking, as well as pimping and pandering

8   incidents, in large part due to the intercepts.  He also learned from confidential sources that some

9   of the targets and the organization as a whole were preparing for "war" and intended to arm

10   themselves and retaliate for a previous gang-related shooting.  WT-210-211.

11        Sergeant Chorley further detailed efforts following Judge Massullo's initial wiretap order

12   to conduct traditional surveillance and to utilize confidential sources to further the investigation's

13   goals, as well as law enforcement's relative ineffectiveness in identifying all members of the

14   conspiracy and in establishing sufficient evidence to dismantle the Sureños organization.

15   Specifically, he noted the targets' recent detection and suspicion of police surveillance.  *See*, *e.g.*,

16   WT-214.  He also described informants' continued inability to penetrate the organization, and the

17   failure of undercover officers to gain evidence of the gang's pimping and pandering activities.  He

18   noted that despite more recent arrests and evidence gathered against the Sureños, the organization

19   continued to persist.  Judge Massullo executed an extension order on October 22, 2012, which

20   was substantially similar to the earlier order of September 9, 2012.  Scoble Decl. Ex. 11.

21        On November 4, 2015, the moving defendants filed the Motion to Suppress that is now at

22   issue.  The government opposed the motion and filed briefing.  The Court held a hearing on the

23   motion on December 18, 2015.

## II.   DISCUSSION

25   A.    Standing

26        The government challenges Cortez' standing to challenge the wiretaps at issue, and he

27   concedes that he does not have standing.  The government agrees each other moving and joining

28   defendant has standing.  A defendant may only move to suppress the fruits of a wiretap if he was a

participant in an intercepted communication or had a protected privacy interest in the tapped phone (e.g. he was the primary user of the phone or it was on his premises).  *United States v. King*, 478 F.2d 494 (9th Cir. 1973).  Cortez does not object to the government's challenge to standing. The Court finds that Cortez does not have standing to challenge the wiretaps, and **DENIES** the Motion to Suppress as to him.[7]

B.      The Applications for the Wiretap Orders Provided Full and Complete Statements of Necessity Sufficient to Satisfy 18 U.S.C. § 2518(1)(c)

1.      Standard of Review

18 U.S.C. § 2518(1)(c) requires "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c).[8]

18 U.S.C. § 2518(3)(c) permits a Court to grant an application only if the judge determines on the basis of the facts submitted by the applicant that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(3)(c).

The Court reviews de novo "whether the application for wiretapping was submitted in compliance with [18 U.S.C. § 2518(1)]." *United States v. Garcia-Villalba*, 585 F.3d 1223, 1228 (9th Cir. 2009).  While an application cannot merely recite "boilerplate" language regarding necessity that would be true of any investigation, *United States v. Blackmon*, 273 F.3 1204, 1211 (9th Cir. 2001), it is enough that the application sketches the "nature and contours" of an investigation with enough specificity to enable a reviewing judge to reasonably ascertain whether

---

[7] Even if Cortez had standing, the Court would deny the Motion as to him and all the other moving defendants for the reasons stated herein.

[8] The defendants make a conclusory statement that suppression also lies because of the applications' failure to satisfy Section 2518(1)(b).  To the extent that the defendants are pursuing this argument, that section, which requires the application to identify the offenses and targets being investigated, as well as the things and communications to be intercepted, was satisfied here. *See United States v. Turner*, 528 F.2d 143, 151-152 (9th Cir. 1975) (finding Section 2518(1)(b) satisfied by similarly descriptive allegations of defendant's involvement in narcotics trafficking supported by statements from informants and corroborated by agents participating in controlled buys, as well as defendant's prior criminal involvement in similar offenses).

United States District Court
For the Northern District of California

the continued use of traditional surveillance would be fruitless.  *United States v. Baker*, 589 F.2d 1008, 1011 (9th Cir. 1979).

      2.    <u>Sergeant Chorley Describes in Sufficient, Case-Specific Detail Why Various Other, Less Intrusive Means of Investigating the Sureños Would Not Succeed</u>

Sergeant Chorley's initial affidavit plainly demonstrated that the Sureños gangs under investigation had engaged and continued to engage in illegal activities for more than ten years, including specific narcotics and firearms transactions contemplated or completed within a few weeks of the wiretap application.  This was so despite the extensive efforts the police had previously employed to prosecute various facets of the organization, including three years of physical surveillance, the use of six informants, phone record and DNA analysis, search warrants, witness statements, and more than 30 arrests and convictions of various gang members over that ten year period.

Addressing similarly complex organizations, the Ninth Circuit has found that the "broad-based" natures of such conspiracies, made up of many members of unknown identities and many more associates of unknown numbers, whose individual criminal acts must be understood not just in isolation but in relation to the conspiracy as a whole, present unique problems for law enforcement.  *See, e.g.*, *United States v. McGuire*, 307 F.3d 1192, 1197-1198 (9th Cir. 2002) (involving armed anti-government faction); *see also United States v. Shryock*, 342 F.3d 948, 976 (9th Cir. 2003) (involving Mexican Mafia).  The Court recognized that for such organizations, with countless and at times disjointed criminal tentacles, infiltration alone would seldom be sufficient to identify the full extent and nature of their criminal activities.  *See McGuire*, 307 F.3d at 1199; *see also Shryock*, 342 F.3d at 976.  Accordingly, the Ninth Circuit affords the government wide leeway when investigating such conspiracies.  *McGuire*, 307 F.3d at 1198.

The defendants complain that the investigative aims were set so broadly as to permit virtually limitless wiretap surveillance, and that Sergeant Chorley had not shown or explained why traditional investigative techniques in concert would fail.  The moving defendants rely largely on *Blackmon* in support of their claim that the application failed to sufficiently make the requisite statement of necessity.  *See* Deft. Brief at 37.  But *Blackmon* is distinguishable for at least two

reasons.  First, the wiretap application in *Blackmon* copied almost verbatim the allegations of

necessity from a previous wiretap application, including details about the government's previous

investigation, which were manifestly untrue as to Blackmon.  *Blackmon*, 273 F.3d at 1208.

Second, the Court found that stripped of those misstatements, the application had failed to

describe any individualized attempts to investigate the defendant, and made only general

statements about the secretive nature of drug conspiracies true of any narcotics investigation.

*Blackmon*, 273 F.3d at 1210-1211.

Sergeant Chorley did more than make general allegations true of any narcotics

investigation, and the defendants do not claim for the purposes of this motion that his wiretap

applications contain any misstatements or omissions.   Sergeant Chorley explained why specific

informants had failed to penetrate the organization, and described why the nature of this

organization and these targets made it difficult to utilize techniques such as undercover officers,

physical surveillance, witness subpoenas, and others.  Although some of the circumstances

Sergeant Chorley described might be true of similar street gangs or drug conspiracies, Sergeant

Chorley did not rely on general truths to support his application.[9]  For example, Sergeant Chorley

noted that the Sureños gangs under investigation initiated its members at a young age and required

members to engage in sustained, illegal, and violent activities, making undercover officers a risky

and potentially futile avenue of investigation.  While perhaps something similar could be said of

other organizations, Sergeant Chorley did not refer to the similarities that the Sureños bore to any

other organization, but referred specifically to circumstances true of the Sureños street gangs at

issue (and not, *e.g.*, Sureños prison gangs).

The Ninth Circuit has distinguished *Blackmon* in similar cases where the government

provides case-specific information explaining why a wiretap is necessary.  *See United States v.

Canales Gomez*, 358 F.3d 1221, 1224-1225 (9th Cir. 2004) (distinguishing *Blackmon* where,

although government had set out similarly broad investigative goal of identifying the key

---

[9] Sergeant Chorley did not make only generalized allegations true of every conspiracy.  Not every conspiracy would suffer from some of the case-specific details alleged by Sergeant Chorley, including, for example, his allegations about the gang's membership requirements or the fact of frequent change of residences made it difficult to conduct mail covers.

personnel, suppliers, customers, and drug-locations of a large narcotic network, government had also detailed why it was unable to complete those goals through the use of specific informants and undercover agents); *see also United States v. Rivera*, 527 F.3d 891, 899-900 (9th Cir. 2008) (finding *Blackmon* rule concerned applications that "contained *only* generalized statements" of necessity and distinguished *Blackmon* where applicant detailed why each confidential source or source of information was unable or unlikely to achieve goals of investigation).  Because Sergeant Chorley did more than make only generalized statements, and the defendants do not allege any misstatements or omissions, the Court finds *Blackmon* distinguishable.

Moreover, the Court does not find that the applications set too broad a goal so as to permit wiretap surveillance under virtually any circumstance.  Contrary to the defendants' position, the Ninth Circuit has approved wiretap applications with similar goals and similar specificity to the ones here.  *See Canales Gomez*, 358 F.3d at 1225-1226; *see also McGuire*, supra.  The application's goals are also consistent with those approved by other district courts.  *See United States v. Ai Le*, 255 F. Supp. 2d1132, 1137 (E.D. Cal. 2003) (citing *McGuire*) (rejecting defendants' claims that government had manufactured necessity by defining goals of investigation to include extirpation of broad drug conspiracy); *see also United States v. Lopez*, No. CR 06-00466 DDP, 2008 WL 2156758, at *6 (C.D. Cal. May 19, 2008) (unpub.) (rejecting claims of overbroad investigative goals when government identified basis for its objective and specific reasons for seeking wiretap).

As the Ninth Circuit instructs, fears of unlimited wiretap surveillance justified solely on the basis of an alleged conspiracy are unwarranted when the application provides specifics and not mere conclusions, when the application is supported by probable cause, and when an impartial magistrate must independently assess the government's necessity and probable cause determinations.  *United States v. Sandoval*, 550 F.2d 427, 430-431 (9th Cir. 1976).  Indeed, suppression is reserved only for those defects in an application or order where the defect clearly contravenes Congress' intent to limit wiretaps to cases of demonstrable need.  *See United States v. Donovan*, 429 U.S. 433-434 (1977).  Here, the police spent considerable effort short of the intercepts investigating a criminal conspiracy which had existed in some form or other for between

15

1    10 and 20 years and had survived more than 30 arrests and convictions of multiple conspirators.

2           The defendants claim that the goal of identifying all member "and associates" of the

3    Sureños gang was so broad that no investigation short of a wiretap could accomplish that goal.

4    First, the Court agrees with the government that "associates" used in the context of the application

5    as a whole does not cover anyone who loosely associates with the gang.  Instead, it is used as a

6    term of art – covering those who, while not strictly gang "members", nonetheless aided,

7    encouraged, or otherwise participated in gang-related criminal conduct.  Second, even if the Court

8    were persuaded (and it is not) that the term "associate" should be broadly read, the wiretap

9    application was in fact only justified in reference to gang members and active associates in

10   relation to specific target offenses, not on anyone loosely associated with the gangs.

11          Similarly, Sergeant Chorley's application for the extension of the order also satisfies the

12   statute.  In applying for an extension of a previous wiretap order, the government may not

13   summarily rely on the necessity of the previous order as the basis for its claim to the necessity of

14   the subsequent order. *Garcia-Villalba*, 585 F.3d at 1231. Each application must be assessed

15   independently - "[t]he key question will always be whether the wiretap application separately

16   satisfies the necessity requirement." *Garcia-Villalba*, 585 F.3d at 1232; *see also United States v.*

17   *Gonzalez, Inc.*, 412 F.3d 1102, 1113-1114 (9th Cir. 2005) (amended at 437 F.3d 854) (upholding

18   suppression of wiretap evidence where government had only done "limited" investigation of

19   location in wiretap application after previously investigating other locations where wiretaps were

20   already approved).  However, a court is not required to address an application in a vacuum;

21   historical facts from the same investigation may be relevant and considered by a court reviewing

22   an extension application if they bear on the government's continued showing of necessity. *Id.*  For

23   example, the fact that the government had previously tried and failed to infiltrate an organization

24   may be evidence that future attempts would continue to be futile.  *Id.*

25          Here, in addition to many of the same persistent conditions which previously inhibited the

26   police's ability to infiltrate or prosecute the gang, Sergeant Chorley also alleged new information

27   relevant to the necessity showing.  After conducting their initial intercepts, the police were able to

28   apprehend some of the targets or obtain other useful evidence towards the successful prosecution

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1    of other Sureños members.  For example, the police were able to identify some of the previously

2    unknown contacts as participating in some or all of the target offenses.  The police were also able

3    to formulate different approaches to their other surveillance techniques based on this new

4    information.

5          Sergeant Chorley's extension application also noted that some of the targets continued to

6    use the tapped phones to discuss and complete new illegal acts, such as additional narcotics sales

7    as well as pimping and pandering, *even while* other members of the organization were being

8    apprehended based on this new evidence.  He noted that some of the targets had become more

9    wary of police detection and discussed instances where some of the targets detected or suspected

10   police monitoring.  And he noted that some of the confidential sources who had initially been

11   cooperative were also more wary of engaging in potential dangerous activities with the Sureños

12   due to the fact that the Sureños were preparing for "war" over a gang-related shooting.  He

13   concluded that further interception was therefore necessary to gather evidence as to new or

14   ongoing gang activities and to avoid detection by the targets.

15         The defendants' reliance on *Gonzalez, Inc.* is unavailing; in contrast to *Gonzalez*, the

16   police here continued to attempt traditional investigative techniques; the targets of the

17   investigation continued undeterred even while some of their members were being apprehended.  It

18   was evident from Sergeant Chorley's extension application that the police, despite efforts

19   subsequent to the initial application order, could not succeed in extinguishing the gangs' activities

20   short of continued wiretap surveillance.

21         Accordingly, the Court finds that each application independently satisfied the statutory

22   requirements of Section 2518(1)(c).

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

United States District Court
For the Northern District of California

### III.   THE SUPERIOR COURT PROPERLY FOUND THE ISSUANCES OF A WIRETAP ORDER AND EXTENSION ORDER NECESSARY TO ACHIEVE THE GOALS OF THE INVESTIGATION AND THAT NO LESS INTRUSIVE MEANS OF INVESTIGATION WOULD BE REASONABLY LIKELY TO ACHIEVE THOSE GOALS

A.   Standard of Review

The parties agree that the Court reviews the Superior Court's findings of necessity (as distinct from the facial sufficiency of the completeness of the statement of necessity contained in the application discussed above) for abuse of discretion and that the facts stated in the supporting affidavit are assumed to be true in the context of this motion. *See Garcia-Villalbla*, 585 F.3d at 1228. In assessing the findings of necessity under the Wiretap Act, the court uses a "common sense" approach that balances the government's reasonable, good faith efforts to employ less intrusive means of investigation against its decision to forego such tactics based on the unlikelihood of success or the danger or risk they pose. *Id.* Law enforcement need not exhaust every possible alternative. *See United States v. Carnero*, 861 F.2d 1171, 1181 (9th Cir. 1988). This level of review affords the issuing court deference owed to its "considerable discretion" in determining whether to approve a wiretap order. *See United States v. Brone*, 792 F.2d 1504, 1506 (9th Cir. 1986); *see also Ai Le*, 255 F. Supp. 2dat 1134 (holding that a district court reviewing a wiretap application must review for abuse of discretion); *see also* 86 C.J.S. Telecommunications Section 286("On judicial review of the legality of an interception pursuant to an order, the court should give great deference to the decision of the judge who issued the order.").[10]

---

[10] Every Circuit, with the possible exception of the Eighth Circuit, appears to afford the issuing court similar deference on appeal. *See, e.g.*, *United States v. Ashley*, 876 F.2d 1069, 1073 (1st Cir. 1989); *cf. United States v. Davis*, 882 F.2d 1334, 1343(8th Cir. 1989) (opining that issue of necessity was factual issue subject to review for clear error). In *Ashley*, the First Circuit explained that when the *issuing* judge and the *trial* judge differ for purposes of adjudging a motion to suppress the fruits of a wiretap application, the trial judge should use the same level of review as an appellate court. *Ashley*, 876 F.2d at 1074; *see also United States v. Garibay*, No. 13CR4514-BEN, 2015 WL 468404, at *4-5 (S.D. Cal. Feb. 3, 2015) (unpub.) (finding that no Ninth Circuit precedent controlled level of deference District Court should afford another Court's wiretap order, and applying abuse of discretion).

United States District Court
For the Northern District of California

B.      Sergeant Chorley's Application Demonstrated an Inability of the Police to Successfully Investigate and Prosecute the Entire Sureños Gangs Under Investigation Without the Aid of Wiretaps

Because of the special dangers involved in complex conspiracies and the wide leeway the Court affords the government in such cases, the Ninth Circuit has "consistently upheld findings of necessity where traditional investigative techniques lead only to the apprehension and prosecution of the main conspirators, but not to apprehension and prosecution of . . . other satellite conspirators." *Rivera*, 527 F.3d at 902 (quoting *McGuire*, 307 F.3d at 1198).

In his initial wiretap application, Sergeant Chorley provided the Superior Court with detailed information explaining the various methods the police had unsuccessfully used to dismantle the organization.  Despite ten years of intermittent arrests, three years of physical surveillance, phone record analysis, DNA analysis, various failed attempts to insert informants or undercover officers into the organization, and more than thirty convictions for various gang offenses for multiple members of the conspiracy, the Sureños conspiracy continued unabated. Evidence of this was patent in that some of its members continued to discuss and complete illegal acts within the *weeks* prior to the wiretap application *in spite* of the prior arrests and their knowledge or suspicion of police monitoring, and the Superior Court's finding of necessity was within its broad discretion.  *See United States v. Bailey*, 607 F.2d 237, 242 (9th Cir. 1979) (upholding wiretap application where six months of traditional investigation failed to reveal full extent of drug conspiracy).  Neither did the fact that the police had had previous successes employing other investigative techniques foreclose the granting of the wiretap order in this case. *See United States v. Carneiro*, 861 F.2d 1171, 1181 (9th Cir. 1988).  The police are not required to use wiretaps only as a last resort.  *Id.*  Ten years of intermittent arrests and convictions of some but not all of the gang members, three years of physical surveillance, and the use of multiple confidential sources with specific individual and collective shortcomings was not unreasonable means of prior investigation.  As the Ninth Circuit recognized, "Like the Hydra of Greek mythology, the conspiracy may survive the destruction of its parts unless the conspiracy is completely destroyed."  *McGuire*, 307 F.3d at 1197-1198 (recognizing the government's powerful

United States District Court
For the Northern District of California

1    interest in identifying all conspirators and the full extent of the conspiracy).[11]   And as noted above,

2    the insufficiency of other means of investigation were for the most part case specific and not based

3    on conclusory assertions generally true of all investigations.

4          For similar reasons, the Superior Court acted within its discretion in approving the wiretap

5    extension order.  The same conditions existed which had previously made infiltration and physical

6    surveillance difficult.  In fact, Sergeant Chorley noted some occasions subsequent to the execution

7    of the original wiretap order where the targets had observed police surveillance vehicles.

8    Witnesses and willing informants remained in short supply, and had become more wary in light of

9    pending "war" with rival gangs.  But even in the face of new arrests and information uncovered as

10   a result of the original wiretap, it was evident to the Superior Court that the conspiracy had not

11   been extinguished and all its members identified.  Target members of the conspiracy continued to

12   engage in illicit narcotics transactions, and Sergeant Chorley also discovered new evidence of

13   pimping and pandering while monitoring the intercepted communications.  In the face of this new

14   evidence and continued criminal conduct, it cannot be said that the Superior Court abused its

15   discretion.

16         Accordingly, the Court upholds the Superior Court's findings as to necessity for both

17   wiretap orders.

18   C.    The Police Complied With the Initial Wiretap Order

19         The moving defendants last argue that more than 150 intercepted communications

20   intercepted after 4:04 p.m. on October 9, 2012, but before the Superior Court executed the

21   extension order, must be suppressed because the police did not comply with the terms of that

22   Court's orders. This argument fails in light of the Superior Court's order, which provides that

23   interception under the order "shall terminate upon attainment of the authorized objective, or in any

24   event, no longer than 30 days from the *date of the first interception* or ten days after the execution

25

26   _____

27   [11] To the extent that the defendants complain that the Superior Court abused its discretion by
     approving a wiretap application whose goals included the identification and apprehension of all of
     the gang's "associates," as noted above, the Superior Court acted within its discretion as the
28   wiretap order was justified by a narrower purpose, focusing on communications relating to
     specific target offenses for which there were predicate prior acts and patterns of conduct.

of this order . . . ." (emphasis added).  Interception began on September 10, 2012.  30 days from *that date*, as defined under the order, would have been October 10, 2012.  The police halted monitoring at approximately 11:40 p.m. on October 9, 2012.

## IV.    THE SUPERIOR COURT PROPERLY FOUND THERE TO BE PROBABLE CAUSE

A.    Standard of Review

The parties agree that this Court should review the Superior Court's probable cause determination for abuse of discretion.  A reviewing court should uphold an issuing court's probable cause determination if the application for the wiretap provides a substantial basis sufficient to sustain a finding that an individual is committing, has committed, or is about to commit specified offenses; that communications related to the offense will be intercepted through the wiretap; and that the individual who is the focus of the wiretap investigation will use the tapped phone.  *United States v. Meling*, 47 F.3d 1546,1552 (9th Cir. 1995).  The parties agree that on this facial challenge, the facts in the affidavit are assumed to be true.

B.    Sergeant Chorley's Applications Describing Patterns of Illegal Transactions and Discussions of Transaction Were Sufficient to Establish Probable Cause

The table set forth above in Section I.A. contains descriptions as to each target gang member establishes a clear predicate for probable cause to believe each target would use his target phone to further and/or conduct illegal activities.  The Ninth Circuit has previously upheld an issuing Court's finding of probable cause under similar circumstances in *United States v. Brown*. *United States v. Brown*, 761 F.2d 1272, 1276 (9th Cir. 1985).  In *United States v. Brown*, the affidavit alleged that one of the targets of the wiretap at issue told the affiant that she was participating in a large-scale narcotics conspiracy with the other targets, ingested cocaine in the affiant's presence, conducted a narcotics transaction on the telephone in the affiant's presence, and asked the affiant to store the proceeds from the narcotics transaction.  *Id.*  Telephone records showed an unusually high volume of contacts between the other two targets during times when law enforcement suspected the deals were taking place.  *Id.*  And an informant told law enforcement that one of the targets had admitted to dealing in narcotics and observed that

United States District Court
For the Northern District of California

1 individual possessing narcotics and accumulating rapid wealth.  *Id.*  The court found that these

2 allegations were sufficient to support a finding of probable cause.  *Id.*

3   Each of the targets whose phones Sergeant Chorley sought to intercept used those phones

4 to complete or discuss illegal firearms or narcotics transactions numerous times and within weeks

5 of the initial wiretap application.  Those conversations were recorded and Sergeant Chorley

6 described his observations of those transactions to the Superior Court.  Sergeant Chorley also

7 personally observed some of the targets delivering contraband as part of controlled drug buys.

8 Sergeant Chorley's affidavit also alleged that multiple informants had observed certain targets

9 engaged in illicit narcotics and firearms transactions.  He also provided the Superior Court with

10 three overlapping periods of phone records showing substantial contact between the gang's

11 members, especially when the police suspected they were engaged in illegal activities.  Sergeant

12 Chorley also described witness statements, phone records, DNA evidence, and stored text

13 messages in connection to a gang-related homicide.

14   However, Sergeant Chorley did not merely allege these individual transactions occurred in

15 isolation; he also placed them in the context of a broad criminal conspiracy.[12]  Sergeant Chorley,

16 who had twelve years of experience as a San Francisco Police officer, five years of experience

17 working in the Latin Gang Section, and had spent three years personally surveilling the targets of

18 the wiretap application, provided detailed accounts of previous efforts to investigate and prosecute

19 the two Sureños gangs under investigation.  These included a pattern of gang-related criminal

20 activity resulting in more than thirty arrests and convictions for gang-related conduct over a ten-

21 year period.  Many of the targets of the application were admitted gang members, and frequented

22 known gang areas and associated with known gang members on numerous occasions.

23   The moving defendants complain that Arroyo's alleged prior firearms transgressions

24

25 [12] California Penal Code Section 182.22(a), one of the alleged substantive offenses, additionally

26 penalizes active gang participation as a substantive offense; the elements of that offense are (1)
active participation in a criminal street gang; (2) with knowledge that the gang's members engage

27 in or have engaged in a pattern of criminal gang activity; and (3) willful promotion, furtherance or
assistance in any felonious criminal conduct by members of that gang.  *People v. Lamas*, 42 Cal.

28 4th 516, 523 (2007).

United States District Court
For the Northern District of California

occurred too far in time to serve as the basis for a finding of probable cause.  The defendants' staleness argument fails because Sergeant Chorley's application established that Arroyo and the other named targets had engaged in a pattern of gang-related criminal activities, including two gun transactions within 18 months of the application.   Arroyo had negotiated and completed firearms transactions in March and September 2011.  He had begun negotiating another sale in August 2012; although that transaction was not complete at the time Sergeant Chorley executed the application, the wiretap application was made within 2 1/2 weeks of those discussions.  Not enough time had elapsed to conclude whether the transaction would in fact not be consummated.[13] In any event, consummated or not, the recorded conversation indicated that Arroyo still intended to engage in trafficking of guns.

The Superior Court could permissibly rely in part on Sergeant Chorley's training, experience, and particular expertise in concluding that the particular acts that he described were evidence of a pattern of criminal conduct.  *See*, *generally*, *United States v. Fernandez*, 388 F.3d 1199, 1254 (9th Cir. 2004) (Court may rely on agent's familiarity with suspects in conjunction with other information to find probable cause); *but see United States v. Spagnuolo*, 549 F.2d 705, 710 (9th Cir. 1977) (affidavit containing only conclusions related to government's general experience and familiarity with similar cases not sufficient).  The Superior Court could similarly conclude that there was probable cause that Arroyo and the other named targets would continue to use the target telephones and others to discuss and commit crimes in furtherance of the criminal conspiracy of which their previous dealings were exemplars; claims that those dealings were stale must be reviewed in the context of evidence of a pattern of illegal conduct.  *See Angulo-Lopez*, 791 F.2d at 1399 (finding search warrant not stale where probable cause is based on continuing pattern); *see also United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991) (holding that when the evidence sought is of an ongoing criminal business, even a two-year lapse may not render information stale); see *also United States v. Leasure*, 319 F.3d 1092, 1099 (9th Cir. 2003) ("When an affidavit 'establish[es] the existence of a widespread, firmly entrenched, and ongoing narcotics

---

[13] The September, 2011 gun transaction took three weeks to complete.

**United States District Court**
For the Northern District of California

operation .... staleness arguments lose much of their force'") (quoting *United States v. Hernandez-Escarsega*, 886 F.2d 1560, 1566 (9th Cir.1989)).

The defendants' arguments that the acts Sergeant Chorley alleged did not establish probable cause that the targets would use the targeted telephones in connection with any previous or ongoing offense also fails because this argument discounts the relationship the targets had with the entire criminal enterprise.  Probable cause need not be based on the expectation that the named targets would discuss the exact same acts they had previously committed when those acts were done in the context of a larger ongoing conspiracy.  Past acts are relevant to establishing a pattern of illegal behavior, and a pattern, if established, raises an inference that future illegal conduct will continue.  Although a "single act . . . does not establish probable cause, a pattern of such behavior . . . does give rise to probable cause."  *United States v. Angulo-Lopez*, 791 F.2d 1394, 1398 (9th Cir. 1986).  This is especially true when the target offenses include active gang participation as part of an overarching conspiracy.[14]  The government may prosecute conspiracies whose danger often extends to crimes "unrelated to the original purpose for which the group was formed." *See McGuire*, 307 F.3d at 1197 (quoting *Callanan v. United States*, 364 U.S. 587, 593-594 (1961).  In light of the pattern of prior conduct and on-going communications among target members, which the Superior Court could reasonably have inferred was connected with the criminal enterprise, there was a substantial basis for the Superior Court to conclude that the targets would use the targeted phones in relation to the targeted offenses, including the offense of active gang participation.  The Superior Court did not abuse its discretion in finding probable cause for the wiretaps.

So too do the allegations contained in Sergeant Chorley's application for an extension support a finding of probable cause.  In addition to the previous offenses Sergeant Chorley

---

[14] The defendants argue that the Superior Court could not rely on Sergeant Chorley's "stimulation tactic" to find probable cause as to discussions about the homicides.  As discussed above, there was a sufficient basis for the Superior Court to find probable cause based on the pattern of criminal activity of which, *e.g.*, the described homicides were exemplars; given the breadth of a pattern of conduct, the government disclaimed reliance on the stimulation portion of the affidavit in its opposition.

discussed in his initial affidavit, as noted above, Sergeant Chorley described new and ongoing narcotics transactions completed with the assistance of some of the tapped telephones.  He also discovered evidence of pimping and pandering.  In support of these allegations, Sergeant Chorley discussed information he learned by directly observing the targets engaged in or discussing such activities on the intercepted communications.  *See Canales Gomez*, 358 F.3d at 1227 (describing wiretap evidence "out of the mouths" of defendants as the gold standard of trustworthy evidence). The Court finds that the Superior Court's probable cause findings as to the original and extension orders were proper and not an abuse of discretion.

C.      The Police Complied With the Initial Wiretap Order

The moving defendants last argue that more than 150 intercepted communications intercepted after 4:04 p.m. on October 9, 2012, but before the Superior Court executed the extension order, must be suppressed because the police did not comply with the terms of that Court's orders. This argument fails in light of the Superior Court's order, which provides that interception under the order "shall terminate upon attainment of the authorized objective, or in any event, no longer than 30 days from the *date of the first interception* or ten days after the execution of this order . . . ." (emphasis added).  Interception began on September 10, 2012.  30 days from *that date*, as defined under the order, would have been October 10, 2012.  The police halted monitoring at approximately 11:40 p.m. on October 9, 2012.

///

///

///

///

///

///

///

///

///

///

United States District Court
For the Northern District of California

## V.    CONCLUSION

Sergeant Chorley's 48-page initial affidavit satisfies 18 U.S.C. §§ 2518(1)(b) and 2518(1)(c).  The Superior Court acted within its discretion and consistent with Ninth Circuit precedent permissibly found both probable cause and necessity.  The wiretap was executed consistent with the wiretap order.  Accordingly, the Motion to Suppress is **DENIED**.


**IT IS SO ORDERED**.


Dated: January 6, 2016

_____
EDWARD M. CHEN
United States District Judge