UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>EDUARDO ALVAREZ, *et al.*,<br><br>Defendant. | Case No. 14-cr-00120-EMC<br><br>**ORDER DENYING DEFENDANT HERNANDEZ'S MOTION TO SUPPRESS**<br><br>Docket No. 608 |

Defendant Jairo Hernandez has moved the Court to suppress evidence seized following a search of Mr. Hernandez's residence. *See* Docket No. 608 ("Motion") at 3. The Government Opposes this Motion. *See* Docket No. 636 ("Opposition").

The Court heard argument on the Motion on May 11, 2016. Having considered the parties' briefs and arguments presented at the hearing, the Court hereby **DENIES** Mr. Hernandez's Motion to Suppress.

A. Factual Background

On March 11, 2014, Special Agent Alicia MacDonald applied for and received a warrant to search the premises of 37 Dakota Street, San Francisco, California. *See* Docket No. 608-2 ("Hernandez Exhibit B"). Along with statements relating to the Sureño gang in general, Agent MacDonald's Affidavit contained the following statements regarding Mr. Hernandez:

- Agent MacDonald had four years of experience in Homeland Security Investigations, where she was assigned to the Gang Unit in San Francisco, Hernandez Ex. B at SW-0156;

- Based on her experience, Agent MacDonald knew Mr. Hernandez to be a member of the 19th Street Sureños, *id.* at SW-0158, 0160;

- Agent MacDonald knew Mr. Hernandez to have the gang moniker of "Joker," *id*. at 0158;
- The San Francisco Police Department had documented Mr. Hernandez "as being in the presence of" Sureños "on numerous occasions," *id*.;
- Many of these instances were in territory claimed by the Sureños, *id*.;
- Mr. Hernandez had "numerous gang-related tattoos," *id*.; and
- Mr. Hernandez had been indicted by a federal grand jury "for multiple violations of federal law," *id*.

Agent MacDonald also incorporated the federal indictment into her Affidavit by reference. *Id*. at 0156, 0158; *see also id*. at SW-0169 - SW-0188 ("Indictment"). The Indictment stated that,

- Mr. Hernandez, along with thirteen other individuals, conspired to violate Title 18, United States Code, Section 1962 ("RICO"), *see* Indictment ¶ 15;
- Mr. Hernandez, along with thirteen other individuals, "conduct[ed] and participate[d] . . . in the conduct of . . . a pattern of racketeering activity," which "consisted of multiple acts and threats involving murder . . . multiple acts involving dealing in controlled substances . . . and multiple acts indictable under [RICO]" such as "tampering with a witness, a victim, or an informant" and "obstruction of justice," *see id*.;
- Mr. Hernandez, along with thirteen others, "agree[d] together and with each other to kill," and "agreed together and with each other to assault with firearms, knives, and other dangerous weapons," "actual and suspected Norteños, actual and suspected members of other gangs, individuals who defied the will of the 19th Street Sureños, and individuals suspected of cooperating with law enforcement,"
- Mr. Hernandez, along with thirteen other individuals, "conspire[d] . . . to commit assault with . . . firearms, knives, and other dangerous weapons," *id*. at ¶ 22;
- On August 30, 2011, Mr. Hernandez, along with Carlos Vasquez, "knowingly and intentionally did murder Victim-1," "for the purpose of gaining entrance to, and increasing and maintaining position in, the 19th Street Sureños" gang, *id*. at ¶ 25;

2

- On August 30, 2011, Mr. Hernandez, along with Carlos Vasquez, knowingly and intentionally "did use, carry, and discharge a firearm at Victim-1" as part of the RICO conspiracy, *id*. at ¶ 26;

- On August 30, 2011, Mr. Hernandez, along with Carlos Vasquez, "did cause the death of a person through the use of a firearm" "during . . . the murder in aid of racketeering of Victim-1," *id*. at ¶ 27;

- On August 30, 2011, Mr. Hernandez, along with Carlos Vasquez, "knowingly and intentionally did kill, with malice aforethought, Victim-1," *id*. at ¶ 46; and

- In a "Notice of Special Findings," Mr. Hernandez "intentionally killed the victim . . . intentionally inflicted serious bodily injury that resulted in the death of the victim . . . intentionally participated in the act, contemplating that the life of a person would be taken . . . intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person . . . and . . . acted after substantial planning and premeditation to cause the death of a person," *id.* at ¶ 54.

Based on the statements in the Affidavit and the Indictment, Agent MacDonald believed "there is probable cause to believe that [Hernandez's home] presently contains evidence of the existence of and [Mr. Hernandez's] membership in the 19th Street Sureños, which would constitute evidence, instrumentalities, and fruits of a [RICO] violation."[1] Hernandez Ex. B at SW-0162. A federal magistrate judge agreed and granted the requested search warrant. *Id*. at SW-0176.

B.  Analysis

    1.  Legal Standard

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. It permits a warrant to issue only "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id*. Probable cause exists when, "there is a fair probability that contraband or evidence of

---

[1] The Indictment stated "[t]he 19th Street Sureños . . . constitute[d] an 'enterprise' as defined in [RICO]," and that the Sureños' acts formed a pattern of racketeering activity. *Id*. at SW-0173.

a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). In determining whether there is probable cause, judges are instructed to take "a practical, common-sense" approach, and to consider "all the circumstances set forth in the affidavit before [the judge], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information . . . ." *Id*.

Where a magistrate judge has issued a search warrant, that decision is reviewed "for clear error." *United States v. Fernandez*, 388 F.3d 1199, 1252 (9th Cir. 2004), *as modified*, 425 F.3d 1248 (9th Cir. 2005). Deference is given to the magistrate's determination, and the reviewing court asks whether "the magistrate had a substantial basis to conclude that the warrant was supported by probable cause." *Id*.; *see also United States v. Vargem*, 566 F. App'x 580, 581 (9th Cir. 2014) ("The district court did not err in holding that the magistrate judge who issued the search warrant had a 'substantial basis to conclude that the warrant was supported by probable cause'"). Whether there is probable cause is a "commonsense practical question," requiring "[n]either certainty nor a preponderance of the evidence." *United States v. Kelley*, 482 F.3d 1047, 1050 (9th Cir. 2007). Where a magistrate judge has found probable cause, this "will not be reversed absent a finding of clear error." *United States v. Pitts*, 6 F.3d 1366, 1369 (9th Cir. 1993).

Applying this standard here, the Court upholds the warrant as supported by probable cause.

2.  Probable Cause

Mr. Hernandez challenges Agent MacDonald's Affidavit as "facially insufficient to provide probable cause." Mot. at 3. He argues that probable cause cannot be established by "[c]onclusions of the affiant unsupported by underlying facts." *Id*. at 8 (quoting *United States v. Underwood,* 725 F.3d 1076, 1081 (9th Cir. 2013)). Nor can probable cause "rest solely upon the existence of an Indictment." *Id*. (citing *United States v. Ellsworth,* 647 F.2d 957, 964 (9th Cir. 1981). He argues that "[n]o facts were provided suggesting that [he] had committed violent crime," *id*. at 10, and the Affidavit did not "factually connect [him] with gang membership," *id*. at 12. While the Court agrees with the legal principles articulated by Mr. Hernandez, it disagrees with his assessment of the Affidavit.

4

a. <u>The Statements in the Affidavit and Indictment Establish Probable Cause</u>

Mr. Hernandez argues that, because the Affidavit sets forth conclusions rather than facts, they did not establish probable cause. *See* Mot. at 10. However, as noted above, the Affidavit incorporates the Indictment by reference, so the two must be read together as though the statements in the Indictment were written in the Affidavit itself. *See United States v. Seybold*, 726 F.2d 502, 504 (9th Cir. 1984) ("A magistrate may consider the information contained in an indictment in making a probable cause determination."). Considering all the facts as contained in these two documents, there is probable cause to believe that Mr. Hernandez was a member of the 19th Street Sureños and engaged in gang-related criminal activity.

The Affidavit itself is somewhat conclusory.[2] However, the Indictment (which is incorporated by reference into the Affidavit) contains a number of specific facts. It describes specific acts which Mr. Hernandez carried out on the behalf of the 19th Street Sureños: He "agree[d] together and with" thirteen other individuals to kill and/or assault enemies of the Sureños. ¶¶ 20, 22, 45. He murdered someone in order to enter and maintain his position in the Sureños. ¶ 25. He used a gun in this murder, ¶¶ 26, 27, and it was committed "with malice aforethought," ¶ 46.

The Affidavit and the Indictment therefore set forth facts establishing Mr. Hernandez's active involvement in the 19th Street Sureños gang. And they do so with fair specificity. The Indictment describes (1) Mr. Hernandez's conduct, (2) the date on which that conduct occurred, (3) against whom Mr. Hernandez acted, (4) with whom Mr. Hernandez acted, and (5) why Mr. Hernandez performed this act.

Mr. Hernandez argues these statements still are too conclusory, and demands a level of specificity down to *e.g.*, naming which assailant pulled the trigger on August 30, 2011. But that level of detail makes little difference to the question of whether Mr. Hernandez is actually

---

[2] Agent MacDonald stated that she knew Mr. Hernandez to be a member of the 19th Street Sureños, Ex. B at SW-0158, but does not say how she knew this to be true. She said she knew him to have the "gang moniker" of "Joker," *id.*, but did not say how she knew this is a gang moniker as opposed to a nickname. She said Mr. Hernandez has "numerous gang-related tattoos," *id.*, but neither described those tattoos nor explained how she knew they are gang-related.

involved in the gang. For instance, the fact of the agreement "to kill" and "to assault" on behalf of the Sureños would establish Mr. Hernandez is a member of the Sureños, regardless of whether Mr. Hernandez was the triggerman. While the Government must set forth facts which the magistrate judge may assess in determining probable cause exists (and not just rely on the affiant's conclusions), the Government need not prove its case in order to obtain a search warrant. *See Armstrong v. Asselin*, 734 F.3d 984, 990 (9th Cir. 2013) ("all that is needed for a search or arrest warrant is probable cause, not proof"). Thus, the affidavit need not set forth all the specific proof of the murder and Mr. Hernandez's involvement.

Mr. Hernandez argues, however, that *Underwood* prohibits judges from relying on conclusory statements. But *Underwood* addresses the lack of probative facts, not the conclusory nature of statements. In *Underwood*, the Ninth Circuit affirmed a district court's decision to grant the defendant's motion to suppress. 725 F.3d at 1078. Federal agents had swept the defendant's home while arresting him in connection with the investigation of a drug trafficking ring. *Id*. at 1078-79. Rather than obtaining a federal search warrant for Underwood's house, the agents asked local law enforcement to obtain a state search warrant. *Id*. at 1079. A member of the Los Angeles Police Department ("LAPD") applied for the warrant. *Id*. Rather than drafting the supporting affidavit from scratch, the LAPD officer copied and pasted an affidavit from the federal investigation. *Id*.

The Ninth Circuit found that the LAPD officer's affidavit did not establish probable cause for believing that Underwood was a courier for the drug trafficking ring, or that evidence of his activities as a courier would be found in his house. *Id*. at 1081-84. First, the affidavit recited the federal agent's opinions and conclusions about drug traffickers, but did not properly attribute those conclusions to the federal agent. *Id*. The court found these statements did not support probable cause partly because they were not supported by facts, and because they described drug traffickers rather than drug couriers. Because Underwood was accused of being a drug courier, the conclusions about drug traffickers were not probative. *Id*. at 1083. Second, "[t]he only factual support" offered for the affidavit's conclusion that Underwood was a drug courier was the fact that federal agents had seen him delivering wooden crates to drug traffickers. *Id*. at 1079. The Ninth

6

1  Circuit found this fact, though specific, was insufficient because the incident occurred three
2  months before the warrant was applied for, occurred only once, and the affidavit gave no details
3  on whether the crates were ever seized and found to contain drugs.  The description of the incident
4  was therefore not probative of probable cause.  *Id*. at 1083.  Third, the affidavit noted that federal
5  agents had seen a bag of marijuana while sweeping Underwood's house.  *Id*. at 1080.  The court
6  found this did not support probable cause because Underwood was accused of participating in an
7  ecstasy trafficking ring; even if he possessed a "personal-use amount" of marijuana, this was not
8  probative of any ecstasy trafficking.  *Id*. at 1082-83.  Finally, the LAPD affidavit stated that a
9  federal warrant had issued in the case.  *Id*. at 1083.  The Ninth Circuit refused to "allow judges to
10 rely on the mere assertion that another judge previously issued a warrant" because it "would
11 encourage judges to rubber-stamp the conclusions of law enforcement and of each other."  *Id*. at
12 1084.  "[M]ore importantly, this case concerns two different affidavits," and the federal warrant
13 was "based on different and more complete information."  *Id*.  Because the affidavit contained no
14 probative information, the Ninth Circuit found that it did not support probable cause.  *Id*. at 1084.

15 *Underwood* did not suggest that when, *e.g.*, an affidavit asserts that on a particular date the
16 subject of the search (along with another) murdered a victim, the affidavit is insufficient if it does
17 not provide proof of subject's role specific in the murder.  Here, the Indictment sets forth specific
18 conduct by Mr. Hernandez, and that conduct, unlike in *Underwood*, is probative of Mr.
19 Hernandez's alleged membership in the gang.  The Indictment states on a particular date, he "did
20 murder" the victim, "did kill" the victim, and "did use, carry, and discharge a firearm" at the
21 victim.  Hernandez Ex. B at SW-0179, SW-0185.  It states he agreed with members of the 19th
22 Street Sureños to commit these acts (*id*. at SW-0179) for gang purposes and to further Mr.
23 Hernandez's stature within the 19th Street Sureños.  *Id*.  Agent MacDonald sought a warrant to
24 search for "evidence of the existence of and Hernandez'[s] membership in the 19th Street
25 Sureños."  *Id*. at SW-0162.  Unlike in *Underwood*, where the facts were not probative of the
26 offense charged, Agent MacDonald presented facts that were both specific and related to the
27 evidence sought.

28 Mr. Hernandez also argues that a magistrate cannot rely on the indictment alone to

determine probable cause. Mot. at 9 (citing *United States v. Rubio*, 727 F.2d 786, 795 (9th Cir. 1984) (finding no probable cause where affidavit introduced no facts beyond indictment for believing Hells Angels affairs were a RICO conspiracy); *United States v. Ellsworth*, 647 F.2d 957 (9th Cir. 1981) (finding probable cause where indictment was supported by eyewitness statements)). However, while the *fact of* an indictment is insufficient in itself to establish probable cause, a magistrate is entitled to rely on the *facts within* an indictment in determining whether there is probable cause. *See Seybold*, 726 F.2d at 505.[3] That is the situation here.

Because Agent MacDonald only needed to establish probable cause to believe Mr. Hernandez was a member of a gang, and did so, the Court does not find the magistrate judge committed "clear error" in issuing the warrant. Mr. Hernandez's motion is **DENIED**.

### b. In Any Case, the Good Faith Exception Would Apply Here

Even where a warrant is unsupported by probable cause, evidence obtained from the warrant's execution otherwise subject to suppression, *Weeks v. United States*, 232 U.S. 383, is subject to a "good faith" exception where an officer acted "in objectively reasonable reliance" on the warrant. *United States v. Leon*, 468 U.S. 897 (1984). There are exceptions to the exception: where the affiant misled the magistrate, where the magistrate abandoned his or her judicial role, where the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," and where the warrant is so vague as to be facially deficient. *Id.* at 922-23. "To determine whether the officer acted in objectively reasonable reliance, 'all of the circumstances – including whether the warrant application had previously been rejected by a different magistrate – may be considered.'" *Underwood*, 725 F.3d at 1085 (*citing Leon*, 468 U.S. at 922 n. 23).

Relying on *Underwood*, Mr. Hernandez argues the third exception-to-the-exception applies here, because any "reliance on th[e] warrant was objectively unreasonable." Reply at 7-8. In making this argument, he faces a "high" "threshold." *Messerschmidt v. Millender,* ⸺ U.S. ⸺, 132 S.Ct. 1235, 1245 (2012) (holding officers were entitled to qualified immunity in a § 1983 suit,

---

[3] Both parties submitted Seybold as one of the "best cases" supporting their arguments. *See* Docket No. 692 at 2, Docket No. 693 at 1.

because their reliance on the warrant that was at the heart of the suit was not objectively unreasonable).[4]  This threshold has not been met.

An officer's reliance on a warrant cannot be said to be unreasonable where "any arguable defect would have become apparent only upon a close parsing of the warrant application." *Messerschmidt,* 132 S.Ct. at 1250; *Leon*, 468 U.S. at 921 ("In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient.").  The Court has explained that "[i]t is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment," because "the magistrate is more qualified than the police officer to make a probable cause determination." *Messerschmidt,* 132 S.Ct. at 1245 (quoting *Leon*, 468 U.S. at 921; *Malley v. Briggs,* 475 U.S. 335, 346 n.9 (1986)).  Here, it would not have been obvious to a reasonable officer that the facts contained in the Affidavit and Indictment setting forth the specific criminal conduct by Mr. Hernandez in furtherance of the gang, even down to the date, his accomplice and the victim, did not establish probable cause to believe he was a gang member involved in criminal gang-related activity.  This is particularly true where Mr. Hernandez has failed to cite any case on point establishing such insufficiency.

3. The Search Protocol and Scope

Mr. Hernandez argues that the searching officers violated the search protocol because electronic devices were removed from the premises before being searched.  Mot. at 13 (discussing Hernandez Ex. B at SW-0166 - 0167).  The Government explains that no computer forensic agents ("CFA's") were present at the search, and so electronic devices had to be removed as permitted by the protocol.  Opp. at 18.  Mr. Hernandez responds that the officers should have been accompanied by CFA's.  Reply at 8-9.

---

[4] The Supreme Court has explained that "the same standard of objective reasonableness" applies to the good faith inquiry under *Leon* and to qualified immunity analyses. *Messerschmidt*, 132 S. Ct. at 1245 n.1 (quoting *Malley v. Briggs*, 475 U.S. 335, 344 (1986)); *see also United States v. Bursch*, 545 F. App'x 652, 655 (9th Cir. 2013) (citing *Messerschmidt* in a good faith analysis); *United States v. Liew*, No. CR 11-00573-1 JSW, 2013 WL 4525738, at *8 (N.D. Cal. Aug. 26, 2013) (same).

The protocol does not require the Government to have CFA's go on every search. *See* Hernandez Ex. B at SW-0166.[5] Under the terms of the protocol, the officers were entitled to "remove from the search location a device . . . if the device cannot be searched *reasonably* on site, or by mirror-imaging or otherwise duplicating its contents . . . ." *Id*. (emphasis added.) The Government has provided a reasonable explanation for why the devices could not be searched on-site: it conducted multiple searches at once and did not have the staff to send a CFA on every search. Opp. at 7, 18. Because there was no CFA, the devices could not be searched or imaged on-site.[6] Because the devices could not be searched or imaged on-site, the officers were permitted to take them off-site under the terms of the protocol. Since the protocol expressly permitted the officers to remove the devices, the officers do not seem to have exceeded the scope of the protocol by removing the electronic devices.

In any event, a violation of the protocol would not warrant suppression. The exclusionary rule is meant to be invoked for "exceptional reason[s], typically the protection of a constitutional right." *United States v. Harrington*, 681 F.2d 612, 615 (9th Cir. 1982) (refusing to suppress evidence where it was "seized by an officer who, for some technical reason, should not have conducted the search").[7] Even assuming the officers violated the protocol by seizing the electronic devices rather than searching them on-site, this is not so flagrant a violation as to require excluding the evidence. *See, e.g., United States v. Hunter*, 13 F. Supp. 2d 574, 585 (D. Vt.

---

[5] Indeed, the Court can easily envision scenarios in which it would be dangerous for a computer forensic agent to accompany special agents as they execute a warrant.

[6] Moreover, the Declaration of CFA Sacramento suggests that it took several days to search the devices seized during the search of Mr. Hernandez's residence. Even if a CFA had been present on the day of the search, it is not at all clear that the searches or imaging of the devices could have been accomplished on-site, within a reasonable timeframe.

[7] *See also United States v. Collins*, 764 F.2d 647, 655 (9th Cir. 1985) (refusing to exclude evidence, though it was seized by Customs when the DEA should have conducted the search);*United States v. Caceres*, 440 U.S. 741, 754-55 (1979) ("In view of our conclusion that none of respondent's constitutional rights has been violated here, either by the actual recording or by the agency violation of its own regulations, our precedents enforcing the exclusionary rule to deter constitutional violations provide no support for the rule's application in this case."); *Herring v. United States*, 555 U.S. 135, 144 (2009) ("To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.") (refusing to exclude evidence where it was seized based on a recalled warrant).

1    1998) (refusing to suppress, even though DEA agents were participated in search of property in
2    clear violation of protocol prohibiting their presence, where the violation did not rise to the level
3    of "flagrant disregard" of the warrant).

4        Mr. Hernandez also protests the officers' taking too long to search the seized devices.
5    However, the Government appears to have properly requested an extension of the time allotted for
6    searching the devices. Because they sought and received an extension, the officers do not appear
7    to have exceeded the scope of the protocol. Moreover, as explained, *supra*, a violation of the
8    protocol does not require suppression of the evidence. The Motion to Suppress is therefore
9    **DENIED** as to evidence seized from the electronic devices.

10       Finally, Mr. Hernandez seeks to suppress a blue bandana seized during the search. Mot. at
11   17. The warrant's language allowed the searching officers to seize "gang-related clothing and
12   accessories, such as, but not including, blue bandanas and belts." Hernandez Ex. B at SW-0165.
13   The Government argues that this was a typo, and the phrase should have read, "such as blue
14   bandanas and belts." Opp. at 21; Gov't. Ex. B A ¶¶ 6-7. Apparently the officer conducting the
15   search detected the error, corrected it on the fly while searching the premises, and seized a blue
16   bandana. Gov't. Ex. C ¶ 5; Mot. at 4.

17       Where a warrant is otherwise valid, officers are permitted to correct obvious errors. *See*
18   *United States v. Winkler*, No. 3:08-CR-14, 2008 WL 5136463, at *4 (E.D. Tenn. Dec. 4, 2008)
19   (warrant not stale though ostensibly issued in 2006 and not acted on until 2007, where the 2006
20   date was a simple typo); *U.S. v. Hattrick*, 182 F. App'x 649 (9th Cir. 2006) (holding evidence did
21   not need to be suppressed where the warrant's failure to include officers' authority to seize
22   evidence was "a mere technical mistake"). Because the inclusion of the phrase "but not including"
23   was obviously a technical error (there was no reason to exclude blue bandanas and belts from
24   seizure), the Motion to Suppress is **DENIED** as to the blue bandana.

25   ///
26   ///
27   ///
28   ///

11

C. <u>Conclusion</u>

For the foregoing reasons, Mr. Hernandez's Motion to Suppress is **DENIED**.

This order disposes of Docket No. 608.

**IT IS SO ORDERED**.

Dated: June 3, 2016

EDWARD M. CHEN
United States District Judge